**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

TYRONE WILLIAMS,                    :

                  Petitioner       :

                v.                    :

SUPT. DELBALSO,                    :

               Respondent       :

       CIVIL ACTION NO. 3:18-1004

       **(JUDGE MANNION)**

## <u>MEMORANDUM</u>[1]

Petitioner Tyrone Williams ("Williams"), files the instant amended petition for writ of habeas corpus pursuant to 28 U.S.C. §2254 (Doc.13), seeking relief from the Judgment of Sentence entered on January 27, 2012, in Court of Common Pleas of Dauphin County criminal case CP-22-CR-4623, following convictions for first degree murder, criminal conspiracy, and recklessly endangering another person ("REAP"). (Id. at 20).

For the reasons set forth below, the petition for writ of habeas corpus, will be denied.

_____

[1] This matter has been reassigned due to the death of the Honorable James M. Munley.

I.    **State Court Factual and Procedural Background**

During Williams' direct appeal proceedings, the Superior Court of Pennsylvania adopted the trial court opinion "which fully and correctly set forth the relevant facts of this case as follows":

> Brandon Granthon [("Victim")] was shot in the chest and killed on May 5, 2009 at approximately 1:10 a.m. Officer Garrett Miller ("Officer Miller") of the Harrisburg Bureau of Police ("HBP") was dispatched to the corner of Mulberry and Crescent Streets in Harrisburg City to investigate a report of shots fired. The area is known for high crime and drug traffic. Officer Miller found [Victim] lying on the sidewalk in front of the McFarland Building apartments, on his back, with a gunshot wound to the chest. [Officer] Miller stated that [Victim] was dressed in all black including black gloves, and a .40 caliber handgun was on the ground to the left of him. Officer Miller described the scene as initially chaotic as several individuals were in the immediate area. [Victim] was loaded into an ambulance for purposes of transport to the hospital for treatment along with Officer Jeffery Cook ("Officer Cook") of the HBP.
>
> While in the ambulance, the EMS personnel had to cut off [Victim's] pants to administer medical treatment which caused a bag to fall out of the pants to the floor. Officer Cook suspected that the bag contained crack cocaine, so he gave it to Officer Miller who subsequently provided it to the forensic officer. After arriving at the hospital emergency room, the ER physician pronounced [Victim] dead at 1:35 a.m.
>
> The substance in the baggy found on [Victim's] body was tested at the [Pennsylvania State Police ("PSP")] Crime Lab by forensic scientist Nicole Blascovich ("Ms. Blascovich"). Ms. Blascovich determined that the substance contained in the baggy found on [Victim's] body was 8.2 grams of crack cocaine. She also tested a substance suspected to be cocaine which had been obtained by Officer Mark McNaughton ("Officer McNaughton") of the HBP

when he conducted a search of [Victim's] apartment pursuant to a warrant. Ms. Blascovich determined that the substance in the second baggie was crack cocaine weighing 65/100ths of a gram.

Dr. Wayne Ross, a forensic pathologist for the Dauphin County Coroner's Office performed an autopsy on the body of [Victim]. Upon examination of the body, he discovered [a] hole in [Victim's] chest consistent with a gunshot wound. Upon further examination, Dr. Ross determined that a gunshot went into [Victim's] chest entering the 5th rib on the left side, broke the rib, and went through the liver, heart and lungs. Dr. Ross stated that he found a bullet in blood that was in the lung. Dr. Ross concluded that, as there was no soot or residue on the outside of [Victim's] hoodie, the wound was a "distant gunshot wound" and the "path relative to his body was going front to back, left to right, and upward." Dr. Ross concluded within a reasonable degree of medical certainty that the cause of [Victim's] death was a gunshot wound to the chest and the manner of death was homicide. Upon evaluation of the position in which [Victim] was found and the path of the bullet within the body, it was Dr. Ross' opinion that when [Victim] was shot he was pulling his body backwards in some manner, lying on the ground or the shooter was pulling backward and running.

On May 4, 2009, [Victim] called Preston Burgess ("Mr. Burgess"), who is also known as "Pepsi," and asked him [to] set up a deal to purchase an ounce of crack cocaine. Mr. Burgess had known [Victim] for several months as he had been [Mr.] Burgess' drug dealer. [Mr.] Burgess contacted another drug dealer he knew, an individual nicknamed "Duke," to set up the sale for [Victim]. Duke later arrived [at][Mr.] Burgess' house, parked outside in his truck and [Victim] went out to consummate the drug deal. When [Victim] reentered [Mr.] Burgess' house, he stated that he thought that the drugs were "light," meaning less than the ounce he had agreed upon. To remedy the situation, [Mr.] Burgess called Duke who agreed to come back to [Mr.] Burgess' house, later in the evening, to return [Victim's] money in exchange for the drugs.

At the meeting time, [Victim] returned to [Mr.] Burgess' house.

Mr. Burgess described him as being dressed in all black including his pants, shirt and gloves, and acting uncomfortable or skittish. Duke did not show up when expected, so [Victim] left. Later, when Duke arrived at [Mr.] Burgess' house, they arranged for [Victim] and Duke to meet at Kiwi's Bar on 13th and Derry Streets to make the exchange and [Mr.] Burgess gave [Victim's] cellphone number to Duke so the two of them could handle the situation themselves. When Duke was at Mr. Burgess' house the second time that day, Appellant, [whom] [Mr.] Burgess, and later police, knew to be called "Slim," unexpectedly arrived first, a minute or two before Duke. The police first learned that Appellant was at [Mr.] Burgess' house on the night of the murder during Mr. Burgess' testimony at the preliminary hearing for charges filed against [Appellant's co-defendant,] Ronald Burton, who is also known as "Duke." Mr. Burgess had known Appellant from previously buying drugs from him and, when [Appellant] would sell to [Mr.] Burgess, he would come to [Mr.] Burgess' house in a black SUV. Of note is that Appellant had been stopped by police for a traffic violation, in a black Ford Expedition SUV, in May 2010.

Duke and [Appellant] left [Mr.] Burgess' house, on foot, and walked toward the corner of Sylvan Terrace. Mr. Burgess testified that after they left, his girlfriend returned home and they immediately went to a store called the "All Nighter" for cigarettes. While at the All Nighter, within approximately ten (10) minutes of Appellant and Duke leaving, they heard several gunshots fired, one after another. From a police photo array, Mr. Burgess identified Ronald Burton as the person he knew as Duke.

On the night of the murder, two individuals, Greta McAllister ("Ms. McAllister") and Jeffery Lynch ("Mr. Lynch"), were in an alley smoking crack cocaine between Hummel Avenue and Mulberry Street. Both of them testified that they saw two individuals dressed in black with hoods on[,] get out of a dark colored SUV and walk quickly through the alley towards Mulberry Street. Mr. Lynch did not see them carrying guns, but Ms. McAllister did. Mr. Lynch stated he recognized one of the men as an individual nicknamed "Philly" from whom he had previously bought

cocaine. Mr. Lynch testified that he heard the man he knew as "Philly" say "hurry up" as the men crouched by a parked car and a light pole at the end of the alley. [Mr.] Lynch then heard one of the men say "there he go" at the same time he saw another man walking on the opposite side of Mulberry Street. Mr. Lynch said that once the man on the opposite side of Mulberry [Street] was out of his sight, the two men in the alley where he was located ran toward the man across the street. Both Ms. McAllister and Mr. Lynch were headed in the other direction, still in the alley, toward Hummel [Avenue], when shots rang out. Mr. Lynch stated that at least 10 shots, of two different caliber bullets, were fired. Ms. McAllister and Mr. Lynch testified that, after the shots were fired, the men ran back down the alley, toward Hummel Avenue and got back into the dark colored SUV. Later, while being interviewed by Detective Christopher Krokos ("Det. Krokos") of the HBP, Mr. Lynch was able to identify "Philly" from police photos as Ronald Burton.

At the murder scene, HBP forensic investigator Karen Lyda ("Officer Lyda") recovered four (4) spent .45 caliber shell casings on the south side of Mulberry Street, grouped together near the location where [Victim's] body was found. An additional grouping of five (5) spent .45 caliber shell casings was found at the same intersection, across Crescent Street. Officer Lyda also recovered a live .40 caliber bullet and a .40 caliber shell casing. Other evidence obtained at the scene included a mutilated bullet jacket, a cellphone and a left sneaker. Officer Lyda later learned from other investigating officers that a casing was jammed in the recovered .40 caliber hand gun and there were 3 unfired cartridges in the magazine.

During the trial, Corporal Mark Garrett ("Cpl. Garrett") of the [PSP], Bureau of Forensic Sciences processed the firearms evidence submitted by the HBP and presented expert testimony on firearm and tool mark examination. The HBP provided Cpl. Garret with a Beretta semiautomatic .40 caliber pistol, a magazine with three (3) undischarged Remington .40 caliber cartridges, one (1) discharged mutilated bullet jacket, one (1) discharged Remington .40 caliber Smith and Wesson cartridge

and five (5) discharged Winchester .45 automatic cartridge cases. After examination and forensic testing of these items, Cpl. Garrett concluded that the five (5) discharged .45 cartridges were all discharged from the same gun, but were definitely not discharged from the .40 caliber Beretta handgun found by [Victim] at the crime scene.

On August 10, 2009, a 2000 gold Cadillac Deville was stopped by police while Appellant was operating the vehicle. In furtherance of the investigation, on August 13, 2009, Detective Rodney Shoeman ("Det. Shoeman") of the HBP was asked to obtain and execute a search warrant for the vehicle operated by Appellant. Det. Shoeman had been informed that Ronald Burton had been seen in that particular vehicle. Lead investigator Detective Ryan Neal ("Det. Neal") had determined that Ronald Burton was also known in the drug community as "Duke" and "Philly" based on photo identification by [Mr.] Lynch and [Mr.] Burgess.

During the search, plastic bags of clothing and toiletry items were found in the trunk of the car along with a green plastic storage tote. In the green storage tote, Detective Shoeman found documents belonging to Ronald Burton. The documents which were recovered were a 2008 W–2 income reporting form, a letter and a PPL electric utility bill all in the name of Ronald Burton.

Det. Neal reviewed [Victim's] cellphone that had been recovered at the scene of the murder and, in the address book, found a number that he confirmed had belonged to Ronald Burton/Duke. By way of search warrant, Det. Neal was able to obtain and review the records for Duke's phone number for May 4 and May 5, 2009. From the records, Det. Neal reviewed the particular cellphone numbers and call history that belonged to Duke/[Mr.] Burton and [Mr.] Burgess/Pepsi. Upon review of the records for the interactions between [Mr.] Burton, [Mr.] Burgess and [Victim] on the night of the murder, Det. Neal determined that multiple calls were made from [Mr.] Burgess' phone to Duke/[Mr.] Burton's phone that evening, but they eventually ceased as [Mr.] Burgess gave Duke/[Mr.] Burton [Victim's] phone number. During the

remainder of the night, all of the calls placed were between [Victim] and Duke. The last phone call on Duke/[Mr.] Burton's cellphone was at 1:09 a.m. on May 5th, when call activity ceased until approximately 7:00 a.m.

Det. Neal also interviewed Appellant in connection with the shooting of [Victim]. Between the first interview, which was recorded by audio and second interview, which was not recorded, he changed his story. Appellant initially said that he left [Mr.] Burgess' house with [Mr.] Burton, dropped him off and picked him up then spent several hours at the Hollywood casino. His second version of events had him dropping off [Mr.] Burton with another man named Roni, going back to his own house to shower and smoke marijuana before picking up [Mr.] Burton and going to the casino.

Detective Donald Heffner of the HBP assisted Det. Neal by reviewing [Mr.] Burton/Duke's cellular phone historical data records for May 4 and May 5, 2009. More particularly, he reviewed the cell tower data to determine which cell towers were utilized by Duke's cellphone within a 13.8 mile radius, during the timeframe surrounding the murder. Det. Heffner analyzed the data and mapped the cell tower utilization locations and determined that all of the calls made from his phone, around 1:00 a.m. on May 5, 2009, hit cell towers within .5 miles to 2 miles of the crime scene. Additionally, Trooper Greg Kohl ("Trooper Kohl") of the PSP reviewed the records of Appellant's "action card," a type of rewards card one may get for use at the Hollywood Casino. The purpose of the card is to track an individual's gaming history for reporting and promotional purposes. The record which Trooper Kohl analyzed was dated May 12, 2010. Trooper Kohl testified that upon review of Appellant's records, unless he did not use his card during a particular visit, the last three uses of Appellant's actions card took place on May 23, 2009, April 18, 2009[,] and April 16, 2009.

(Trial Court Opinion, filed May 19, 2014, at 2–10) (internal citations and footnotes omitted).

Commonwealth v. Williams, No. 1682 MDA 2012, 2014 WL 10803011, at
*1–4 (Pa. Super. Ct. Aug. 12, 2014).

Procedurally, on January 27, 2012, the jury convicted Williams of first-
degree murder, criminal conspiracy, and REAP. The trial court sentenced
him on April 23, 2012, to concurrent sentences of life imprisonment for his
first-degree murder conviction, twenty to forty years' imprisonment for his
criminal conspiracy conviction, and twelve to twenty-four months'
imprisonment for his REAP conviction. He filed timely post-sentence
motions, which the court denied on August 27, 2012. On September 24,
2012, he filed a notice of appeal raising the following issues:

> Did the Commonwealth present sufficient evidence to find [him]
> guilty of first degree murder, criminal conspiracy, and [REAP]
> beyond a reasonable doubt?
>
> Was the evidence sufficient to find [Williams] guilty of First
> Degree Murder, criminal conspiracy, and REAP on the basis that
> he and Ronald Burton, his codefendant, were accomplices?
>
> Did the Court err, in rulings both pretrial and at trial, by failing to
> suppress [Williams'] inculpatory recorded statement to the police
> on the basis that the statement was taken at a time when [he]
> was under the influence of a controlled substance and, therefore,
> was unable to give a knowing and intelligent waiver of his right
> to counsel under *Miranda* and/or give a knowing, voluntary, and
> free statement to the police?
>
> Did the Court err by refusing to suppress and/or exclude portions
> of [Williams'] recorded statement which permitted the jury to hear
> evidence of other crimes, wrongs, or acts when those portions of

his statement should have been excluded from the trial under Pa
Rules of evidence 403 and 404(b)…?

Id. at *5. The Superior Court affirmed the judgment of sentence on August
12, 2014.

On March 10, 2015, he filed a timely *pro se* PCRA petition. The PCRA
court appointed counsel and counsel filed a supplemental petition. Following
a hearing, the PCRA court dismissed the petition. Williams appealed to the
Superior Court raising the issue of whether trial counsel was ineffective as a
matter of law for his failure to call an alibi witness, Quanisha Williams.
Commonwealth v. Williams, No. 249 MDA 2016, 2016 WL 6901354, at *1, 2
(Pa. Super. Ct. Nov. 23, 2016). The Superior Court affirmed the PCRA court
on November 23, 2016. Id. On January 17, 2018, the Supreme Court of
Pennsylvania denied his petition for allowance of appeal. Commonwealth v.
Williams, 645 Pa. 178, 179 A.3d 7, 8 (2018).

## II.   **Habeas Claim Presented for Review**

Williams presents the following general claim for review: "Trial counsel
was ineffective for not presenting witnesses, arguments, and instructions in
support of a coherent and cogent strategy where self-defense, defense of
others, and imperfect self-defense represented Mr. Williams's primary

- 9 -

defense at trial." (Doc. 13, p. 22). In the subsection "Tyrone Williams's trial" more specific ineffectiveness claims are identified. "Trial counsel did not file a notice of alibi, did not present an alibi witness at trial, did not have Mr. Williams testify in his own defense, did not present Georgio Rochon, and he requested a voluntary manslaughter instruction – which necessarily implied either Burton or Mr. Williams had shot and killed Granthon based on sudden provocation or imperfect self-defense. 18 PA.C.S. §2503. The voluntary manslaughter request, moreover, undercut any sort of indirect alibi argument trial counsel may have made at trial. The trial court denied the voluntary manslaughter request." (Doc. 13, p. 18).


## III.  Legal Standards of Review

A habeas corpus petition pursuant to 28 U.S.C. §2254 is the proper mechanism for a prisoner to challenge the "fact or duration" of his confinement. Preiser v. Rodriguez, 411 U.S. 475, 498-99 (1973). 28 U.S.C. §2254, provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> ...

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding....

28 U.S.C. §2254. Section 2254 sets limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner. Cullen v. Pinholster, 563 U.S. 170, 181 (2011); Glenn v. Wynder, 743 F.3d 402, 406 (3d Cir. 2014). A federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). This limitation places a high threshold on the courts. Typically, habeas relief will only be granted to state prisoners in those instances where the conduct of state proceedings resulted in "a fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with

the rudimentary demands of fair procedure." Reed v. Farley, 512 U.S. 339, 348 (1994) (citations omitted).

## IV.   Discussion

### A.   Exhaustion and Procedural Default

Before considering the merits of Williams' claims, the Court must address Respondent's contention that the claims are procedurally defaulted.

Absent unusual circumstances, a federal court should not entertain a petition for writ of habeas corpus, unless the petitioner has first satisfied the exhaustion requirement articulated in 28 U.S.C. §2254(b). Specifically, habeas relief "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. §2254(b)(1)(A); see also O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). The exhaustion requirement is grounded on principles of comity to ensure that state courts have the initial opportunity to review federal constitutional challenges to state convictions. See Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000); Picard v. Connor, 404 U.S. 270, 275–76 (1971). The habeas statute codifies this principle by requiring that a petitioner exhaust the remedies available in the courts of the State, 28 U.S.C. §2254(b)(1)(A), meaning a state prisoner must "fairly present" his claims in "one complete

- 12 -

round of the state's established appellate review process," before bringing them in federal court. O'Sullivan, 526 U.S. at 845 (stating "[b]ecause the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established review process."); see also Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard, 404 U.S. at 275 (1971); Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997). This requires that the claim brought in federal court be the substantial equivalent of that presented to the state courts. Picard, 404 U.S. at 278; see also McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999) (holding that petitioner must present both "factual and legal substance" of claim to state courts). Mere reliance of state and federal claims on the same constitutional provision does not render the two claims substantially equivalent. See Brown v. Cuyler, 669 F.2d 155 (3d Cir. 1982); Zicarelli v. Gray, 543 F.2d 466 (3d Cir. 1976). Both the legal theory and the facts on which a federal claim rests must have been presented to the state courts. See Picard, 404 U.S. at 277; Brown, 669 F.2d at 158–61.

"When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.' 28 U.S.C. §2254(b). In such cases, however, applicants are considered to have procedurally defaulted their claims and federal courts may not consider the merits of such claims unless the applicant establishes 'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse his or her default. See Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)." McCandless, 172 F.3d at 260.

To demonstrate "cause" for a procedural default, a petitioner must point to some objective external factor which impeded his efforts to comply with the state's procedural rule. See Murray v. Carrier, 477 U.S. 478, 488 (1986). "Prejudice" will be satisfied only if he can demonstrate that the outcome of the state proceeding was "unreliable or fundamentally unfair" as a result of a violation of federal law. See Lockhart v. Fretwell, 506 U.S. 364, 366 (1993).

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent," Murray, 477 U.S. at 496, then a federal court can excuse the procedural

- 14 -

default and review the claim in order to prevent a fundamental miscarriage of justice. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Wenger v. Frank, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. Bousley v. United States, 523 U.S. 614, 623 (1998); Murray, 477 U.S. at 496. A petitioner establishes actual innocence by asserting "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. Hubbard v. Pinchak, 378 F.3d 333, 339-40 (3d Cir. 2004).

Williams concedes that his ineffective assistance of counsel claims were not presented to the state courts and that they are procedurally defaulted. (Doc. 13, p. 11). However, he seeks to excuse the default based on Martinez v. Ryan, 566 U.S. 1 (2010), arguing that "[i]nitial review PCRA counsel's failure to raise these substantial trial counsel ineffectiveness claims was objectively unreasonable under Strickland…" (Doc. 13, p. 19).

## B. **Martinez Procedural Default Exception**

Martinez recognized a narrow exception to the general rule that attorney errors in collateral proceedings do not establish cause to excuse a

procedural default. Specifically, Martinez holds that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." Id. at 9. To successfully invoke the Martinez exception, a petitioner must satisfy two factors: that the underlying, otherwise defaulted, claim of ineffective assistance of trial counsel is "substantial," meaning that it has "some merit," id. at 14; and that petitioner had "no counsel" or "ineffective" counsel during the initial phase of the state collateral review proceeding. Id. at 17; see also Glenn, 743 F.3d at 410.

A petitioner demonstrates that the underlying ineffective assistance of trial counsel claim has "some" merit by "show[ing] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Workman v. Superintendent Albion SCI, 915 F.3d 928, 937-38 (3d Cir. 2019); see also Martinez, 566 U.S. at 13-14. A petitioner demonstrates that post-conviction counsel's ineffectiveness caused the procedural default by showing that post-conviction counsel's performance was deficient under the first prong of the Strickland v. Washington, 466 U.S. 668 (1984) standard. See Preston v. Sup't Graterford, SCI, 902 F.3d 365, 376 (3d Cir. 2018); see also Workman,

915 F.3d at 937–38. Satisfaction of the first Strickland prong requires a petitioner to demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. Strickland, 466 U.S. at 688.

### 1.    Failure to Call Witnesses

Williams argues that PCRA counsel was ineffective in failing to present the claim that trial counsel was ineffective for failing to pursue an alibi defense based on Williams' statement to Detective Neal that he was with Burton and another man named "Roni" at the time of the shooting. Detective Neal testified at trial that Williams made two statements concerning the shooting of Granthon:

> Det. Neal…interviewed [Williams] in connection with the shooting of Granthon. Between the first interview, which was recorded by audio and second interview, which was not recorded, he changed his story. [Williams] initially said that he left Burgess' house with Burton, dropped him off and picked him up then spent several hours at the Hollywood casino. His second version of events had him dropping off Burton with another man named Roni, going back to his own house to shower and smoke marijuana before picking up Burton and going to the casino. (N.T. at 278–281).

Commonwealth v. Williams, 2014 WL 10803011, at *13.

He also argues that counsel was ineffective in failing to present Georgio Rochon in support of his theory that Granthon presumably fired first. (Doc 13, p. 4). He asserts that "trial counsel knew about Georgio Rochon because he gave a statement hours after the shooting on May 5, 2009 – and the Commonwealth disclosed this statement to trial counsel. His statement mimicked his trial testimony at Burton's testimony, *i.e.*, he heard two gunshots from a smaller caliber firearm and then saw a gunman fleeing who fired four gunshots from a larger caliber firearm. More importantly, based on the physical evidence, Rochon's sequencing of events strongly suggests Granthon fired one or two shots *before* Burton or Mr. Williams returned fire." (Id.) (emphasis in original).

In the Superior Court's PCRA opinion addressing Williams' claim that trial counsel was ineffective in failing to call another witness, Quanisha Williams, it was noted that "[t]o prove counsel had been ineffective for failing to call a witness, the PCRA petitioner must show that: (1) the witness existed; (2) the witness was available; (3) counsel knew of, or should have known of the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony was so prejudicial to petitioner to have denied him or her a fair trial. Com. v. Clark, 961 A.2d 80, 90 (Pa. 2008) (citation omitted)." Com. v. Williams, 2016 WL 6901354, at *2.  In

applying Pennsylvania's failure to call a witness standard to Williams' claims, it is clear that he fails to meet his burden. He fails to demonstrate that Roni existed, that he was available, and that he was willing to testify. He further fails to demonstrate that the absence of Roni's testimony was so prejudicial that it denied him a fair trial.

With regard to Rochon, assuming trial counsel was aware that Rochon existed and had knowledge of his statement, there is no evidence that Rochon was available or willing to testify at the time of Williams' trial. Although Rochon testified at the Burton trial, that trial took place in January 2011. Williams' trial commenced a full year later in January 2012. There simply is no evidence that Rochon was available or willing to testify at Williams' trial. Because the underlying failure to call witnesses claims lack "some" merit, he fails to satisfy his burden under Martinez. Federal review of whether trial counsel was ineffective in failing to call either witness Roni or witness Rochon is barred.

### 2.   Failure to Call Williams to Testify

Williams contends that trial counsel was ineffective for failing to call him to testify that he was somewhere else when the shooting occurred. (Doc. 13, pp. 4, 18, 30, 53).

- 19 -

It is well-established that "the accused has the ultimate authority to make certain fundamental decisions regarding the case, [including] as to whether to ... testify in his or her own behalf." Jones v. Barnes, 463 U.S. 745, 751 (1983); see also Rock v. Arkansas, 483 U.S. 44, 49-56 (1987). In Commonwealth v. Miller, 987 A.2d 638 (Pa. 2009), the Pennsylvania Supreme Court opined: "Claims alleging ineffectiveness of counsel premised on allegations that trial counsel's actions interfered with an accused's right to testify require a defendant to prove either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf. Id. at 660 (citations and quotation marks omitted). "The decision of whether or not to testify on one's own behalf is ultimately to be made by the defendant after full consultation with counsel. In order to sustain a claim that counsel was ineffective for failing to call the defendant to the stand, he must demonstrate either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf." Commonwealth v. Uderra, 706 A.2d 334, 340 (Pa. 1998).

Williams states, on several occasions, that trial counsel was ineffective for failing to call him to testify that he was somewhere else when the shooting

occurred. However, these statements are conclusory and unsupported by any facts setting forth exchanges between Williams and trial counsel. He fails to provide evidence of interactions or incidents during which trial counsel interfered with his right to testify or identify specific unreasonable advice given by trial counsel. Because Williams fails to prove either that trial counsel interfered with his right to testify, or gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf, we are compelled to conclude that the underlying claim lacks some merit. As such, Williams cannot avail himself of the <u>Martinez</u> exception to overcome the procedural bar of this claim.

### 3.    Jury Instructions

Williams next contends that trial counsel was ineffective in failing to request, or advocate for, certain jury instructions and that PCRA counsel was ineffective for failing to pursue the jury instructions claims in the initial collateral proceedings. This argument heavily relies on evidence and testimony elicited at the trial of codefendant Burton and the Superior Court's opinion vacating Burton's murder conviction.

By way of background, Burton's trial resulted in a January 28, 2011, judgment of sentence in which the trial court imposed a sentence of life in prison without the possibility of parole for first-degree murder, and attendant

concurrent sentences for conspiracy, REAP, and weapons convictions. (Doc. 13-2, p. 1). In an unpublished Non-Precedential Superior Court of Pennsylvania decision entered on January 20, 2012 (the "Burton Opinion"), in considering Burton's direct appeal, the Superior Court vacated his judgment of sentence and remanded for resentencing and a new trial. See also, Commonwealth v. Burton, 43 A.3d 524 (Pa. Super. Ct. 2012) (Table). Williams attaches the unpublished opinion to his amended petition. (Doc. 13-2, pp. 1-26).

On remand, the Commonwealth elected not to proceed on the homicide charge. Commonwealth v. Burton, No. 1873 MDA 2016, 2017 WL 3172598, at *1 (Pa. Super. Ct. July 26, 2017). On September 29, 2016, after a number of procedural missteps, the trial court resentenced Burton to an aggregate term of incarceration of not less than twenty-two and one-half nor more than forty-five years on the conspiracy, REAP and weapons convictions. Id. at *2.

Williams argues as follows:

The witnesses and evidence in Burton's and Mr. Williams's trials were virtually identical, outside of the evidence in Mr. Williams's trial regarding his custodial statements, his August 10, 2009 arrest in an SUV linked to Burton, and his casino card. Likewise, neither Burton nor Mr. Williams testified. Thus, if the Superior Court said Burton was entitled to self-defense, defense of others, and voluntary manslaughter instructions, this holding should

have prompted trial counsel and PCRA counsel to litigate these issues either at trial or during Mr. Williams's initial-review PCRA proceedings. Remarkably, though, both attorneys spectacularly failed to even mention the Superior Court's *Burton* opinion and why the reasoning in that opinion applied to the facts, witnesses, and evidence in Mr. Williams's case. PCRA counsel either did not read the *Burton* opinion or read the opinion and simply did not make the connection between the two cases. Regardless if it is the former or later [sic], PCRA counsel's decision not to rely on the facts, reasoning, and law articulated in the Burton opinion constitutes deficient performance under *Strickland.*

(Doc. 13, p. 52).

With regard to the self-defense instruction, the Superior Court considered Burton's argument at trial that "the killing was justified in that he acted in self-defense" in the context of whether there was sufficient evidence to support the first-degree murder conviction.[2] (Doc. 13-2, p. 7). The Superior Court opined as follows:

When the defendant raises a justification defense, the Commonwealth must disprove the defendant's claim beyond a reasonable doubt. *Commonwealth v. Rivera*, 603 Pa. 340, 355-56, 983 A.2d 1211, 1221 (2009), *cert. denied*, 130 S.Ct. 3282 (2010). In general, use of force is justified where the actor believes it is immediately necessary to protect himself under the unlawful use of force by another person. 18 Pa.C.S.A. §505(a).

_____

[2] Williams' representation that the Superior Court concluded that Burton was entitled to a self-defense instruction misconstrues the court's decision. The Superior Court did not find that Burton was entitled to a self-defense instruction. Rather, the court considered the defense in the context of whether there existed sufficient evidence to support the first-degree murder conviction.

- 23 -

An actor is not justified in using deadly force unless he believes it is necessary to protect himself from death, serious bodily injury, kidnapping or sexual assault. 18 Pa.C.S.A. §505(b)(2). An actor may not use deadly force if he provoked the assailant's use of force against him. 18 Pa.C.S.A. §505(b)(2)(i). Further, an actor is not justified in using deadly force where he knows he can safely retreat. 18 Pa.C.S.A. §505(b)(2)(ii).

Burton argues that the Commonwealth failed to prove beyond a reasonable doubt that Burton might have provoked Granthon's use of force or that Burton could have safely retreated. As described by the trial court, the record reflects that Burton and Granthon engaged in a drug transaction, after which Granthon accused Burton of shorting him on the amount of crack he received. Burton told Burgess, who arranged the transaction, that he would give Granthon his money back. Before leaving Burgess' house to meet Granthon, ostensibly to give him his money back, Burton was visibly angry. N.T., 1/24-27/11, at 48. Likewise, Granthon was angry because he believed Burton shorted him. *Id.* at 46. Shortly after he left Burgess' house, Lynch saw Burton with one other individual walking quickly down an alley. *Id.* at 141-42, 149. Burton and his companion ducked, one behind a car and the other behind a telephone pole, and one of them said "there he goes." *Id.* at 142. Lynch saw a third man walking by, and Burton and his companion eventually emerged from their hiding places and ran after the third man. *Id.* at 142-43. Another witness testified that both men were armed. *Id.* at 227-28. Approximately twenty seconds later, shots rang out. *Id.* at 143. Shortly after the shooting stopped, Lynch saw Burton and his companion running. *Id.* at 147. They got into a car and drove away. *Id.*

Lynch, an ex-Marine familiar with firearms, believed he heard two different caliber weapons fired. *Id.* at 155, 161, 171. Lynch believed he heard more than five shots and that at least three or four were from a heavier caliber weapon than the others. *Id.* at 161. Another witness who heard the shooting from his home testified that he heard two shots that were "just like a pop-pop" followed by four louder shots that "were more of a bang-bang."

- 24 -

*Id.* at 341. An investigating officer testified that a semi-automatic .40 caliber handgun and one spent .40 caliber casing were found near Granthon's body. *Id.* at 104, 114, 116. A second casing was jammed in the gun. *Id.* at 117. Police also found five spent .45 caliber casings. *Id.* at 111. Granthon was killed by a .45 caliber round. *Id.* at 113.

The record, read in a light most favorable to the Commonwealth, reflects that Burton was angry at Granthon and the Burton and his companion armed themselves and were stealthy in their pursuit of Granthon prior to the shooting. We recognize, as Burton argues in his brief, that Granthon apparently had the smaller caliber weapon and that a witness heard a smaller caliber weapon fire first. Nonetheless, the law of justification does not necessarily hinge upon who fired first. A defendant is not justified in using force in self-defense if he was at fault in provoking the force used against him. 18 Pa.C.S.A. §505(b)(2)(i). The instant record, read in a light most favorable to the Commonwealth as verdict winner, contains evidence from which the jury could find that Burton and his companion, openly carrying firearms and running after Granthon from behind, provoked Granthon's gunfire. Moreover, the witness who heard the gunfire from home testified that he heard two shots, put down his Play Station controller, went to his window, and heard four louder shots. *Id.* at 340. Given the apparent lapse in time between the two volleys of shots, the jury could reasonably find that Burton had an opportunity to retreat but did not. Police found the expended .45 caliber casings approximately 20 feet away from Granthon's body, and from that the jury could infer that Burton was close enough to see that Granthon's gun was jammed. *Id.* at 120. Viewing the record in a light most favorable to the Commonwealth, we conclude that the Commonwealth produced sufficient evidence to disprove Burton's justification defense beyond a reasonable doubt.

(Doc. 13-2, pp. 7-10). The witness who testified to the lapse in time between the two separate volleys of shots was Georgio Rochon. Rochon's testimony is summarized by the Superior Court as follows:

> Georgio Rochon [('Rochon')] was called as a witness for the defense. On the night of May 5, 2009, Rochon stated that he was living at 1230 Mulberry Street, and was home playing video games at one o'clock in the morning. Rochon heard two gunshots, followed by four louder ones, and ran to the window to see what was happening. He then moved over to look out a screen door and saw a man carrying a silver handgun running from the Mulberry Street Bridge towards an alley. Rochon state that the man was about 5'7", stocky, and was a light skinned black male. Rochon testified that the man he saw was not [Burton] who was too tall, heavy, and dark to be the person he saw on the night of May 5, 2009. However, Rochon admitted that he was shaken up during his questioning by police, and that he had only been able to view the individual from across the street.

(Id. at 3).

As concerns the propriety of a defense of others instruction, the Burton Court reasoned as follows:

> Considered in a light most favorable to Burton, the record admits of the possibility that Granthon fired a .40 caliber weapon at Burton and/or his companion before the perpetrator returned fire with a .45 caliber weapon.
>
> Though there is no evidence of a dispute between Burton's companion (presumably Slim) and Granthon, as there was between Burton and Granthon, it is quite possible that Granthon, upon observing two armed men approaching him, opened fire on one or both of them. No witness observed the gunfire exchange. Viewing the record in a light most favorable to Burton, we can discern no valid basis for charging the jury on self-defense but

not defense of others, as the trial court did. We conclude that the lack of a defense of others instruction was error.

(Id. at 16).

Next, in finding that the record could support a voluntary manslaughter

conviction, the Superior Court relied on the following:

The .40 caliber gun found near Granthon's body had jammed. Burton, therefore could have subjectively believed his life was in danger even though the objective facts established that Granthon's weapon was jammed and posed no immediate danger to Burton. Further, one witness testified that a short period of time passed between the opening shots from the smaller weapon and the subsequent shots from the larger weapon. The jury might have concluded that Burton's belief in the need to use deadly force in self-defense became unreasonable during that period of time. [n. 7 Even viewing the record in a light most favorable to Burton, we believe this issue presents a very close question. Nonetheless, the jury was forced to make findings of fact based on the varied testimony of numerous witnesses, and we conclude that the trial court erred in declining to charge the jury on voluntary manslaughter where a guilty verdict on that offense was one of many possible outcomes.] "Under Section 2503(b) a homicide is reduced from murder to voluntary manslaughter if the defendant subjectively believed circumstances justifying the killing existed, but objective reality negates that existence. Logically, the defendant's belief, sincere though unreasonable, negates malice." *Commonwealth v. Carter*, 502 Pa. 433, 442, 466 A.2d 1328, 1332 (1983). The trial court's charge to the jury essentially permitted the jury to equate unreasonable belief justification with the malice necessary to sustain a murder conviction. The trial court therefore provided the jury with an inaccurate statement of the law.

***

The facts of the record and the trial court's erroneous jury charge leave open the possibility that the jury rejected Burton's

justification defense because if found that Burton unreasonably believed that he was justified in killing Granthon. If the jury so found, Burton should have been convicted of voluntary manslaughter rather than first-degree murder. This is a significant error of law, and given the many possible interpretations of the facts of record, we cannot conclude beyond a reasonable doubt that the error did not contribute to the verdict. This error requires a remand for a new trial.

(Id. at 20, 21).

Williams argues that "if the Superior Court said Burton was entitled to self-defense, defense of others, and voluntary manslaughter instructions, this holding should have prompted trial counsel and PCRA counsel to litigate these issues either at trial or during Mr. Williams's initial-review PCRA proceedings. Remarkably though, both attorneys spectacularly failed to even mention the Superior Court's Burton opinion and why the reasoning in that opinion applied to the facts witnesses, and evidence in Mr. Williams's case." (Doc. 13, p. 52). This argument lacks merit.

As noted in the Burton Opinion, "[a] defendant is entitled to a jury instruction when the evidence produced at trial, viewed in a light most favorable to the defendant, would support the instruction. Commonwealth v. Robinson, 554 Pa. 293, 310-11, 721 A.2d 344, 353 (1998), cert. denied 528 U.S. 1082 (2000). The Superior Court's opinion leaves no doubt that Rochon's testimony concerning the sequential order of the caliber of

weapons fired constituted crucial evidence warranting jury instructions on self-defense, imperfect self-defense, and defense of others. Rochon is the only witness to testify to the order in which the shots were fired. While Lynch testified at Burton's trial that he heard two different caliber weapons fired, and that at least three or four were fired from the heavier caliber weapon, his testimony is devoid of facts concerning chronology. It is Rochon's testimony, coupled with testimony concerning the dispute between Burton and Granthon, that supported inferences concerning the order of the discharge of weapons, lapse of time between various caliber of shots fired, Burton's ability to retreat, whether Burton was returning fire, the subjective belief of Burton, and the reasonableness or unreasonableness of that belief. (Doc. 13-2, pp. 9-11, 15, 16, 21, 20). Rochon, however, did not testify at Williams' trial. Williams does not point to any testimony concerning the chronology of the shots fired or any evidence presented during the trial that would have supported instructions on self-defense or defense of others. And we can discern none.

As concerns a voluntary manslaughter charge, counsel requested such an instruction. The following exchange that took place at sidebar during Williams' trial:

> THE COURT:    We're at sidebar and counsel has asked for a charge on voluntary manslaughter. Both regular voluntary manslaughter and mistaken belief voluntary manslaughter. The Commonwealth is objecting.
>
> During the trial of this case there was no evidence of any type of provocation, no evidence of any type of killing in the heat of passion, so there is no basis to charge voluntary manslaughter.
>
> As far as mistaken belief, there's no evidence of any judgment call that was made whether or not to kill the victim in a mistaken belief. So that's not present in the facts either. So I'm not going to charge on mistaken belief voluntary manslaughter. So I'm going to charge on first, third, and nothing else at this point unless you show me some authority.
>
> MR. RENTSCHLER:    Okay. Then I would lodge my objection to the nonreading or non-instruction on that. Okay.

(Doc. 13, p. 43). He argues that counsel was ineffective in failing to offer the Superior Court's Burton opinion in response to the court's request for authority for such an instruction. However, it is clear from a reading of that opinion that there was evidence in the Burton record, specifically, the Rochon chronology testimony and the testimony of the dispute between Burton and Granthon, that supported such an instruction. Conversely, Williams fails to point to evidence adduced at his trial that would have supported a self-defense instruction.

Based on the foregoing, we find that the underlying otherwise defaulted claim of trial counsel's failure to request and advocate for jury instructions on

self-defense, defense of others, and voluntary manslaughter, lacks some merit. Williams therefore fails to meet his burden under <u>Martinez.</u> The claims concerning jury instructions are therefore procedurally defaulted.

## V.   <u>Conclusion</u>

For the foregoing reasons, Williams' petition for a writ of habeas corpus pursuant to 28 U.S.C. §2241 is denied.

## VI.   <u>Certificate of Merit</u>

Pursuant to 28 U.S.C. §2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. §2254. A COA may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. §2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." <u>Miller-El v. Cockrell,</u> 537 U.S. 322 (2003). Williams fails to demonstrate that a COA should issue.

The denial of a certificate of appealability does not prevent Williams from appealing the Order denying his petition so long as he seeks, and obtains, a certificate of appealability from the Third Circuit Court of Appeals. See FED. R. APP. P. 22(b)(1).

A separate Order will issue.

*s/ Malachy E. Mannion*
MALACHY E. MANNION
United States District Judge

**DATED:    August 31, 2020**
18-1004-01

- 32 -